PATRICK E. PREMO (CSB No. 184915)
ppremo@fenwick.com
SHEEVA J. GHASSEMI-VANNI (CSB No. 246639)
sghassemi@fenwick.com
JOHN-PAUL S. DEOL (CSB No. 284893)
jpdeol@fenwick.com
TIARA R. QUINTANA (CSB No. 315783)
tquintana@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA  94041
Telephone:     650.988.8500
Facsimile:     650.938.5200

Attorneys for Plaintiff
GLINT INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLINT INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>PERCEPTYX, INC., a California corporation; MITCHELL ANDERSON, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br>1. **VIOLATION OF FEDERAL DEFEND TRADE SECRETS ACT**<br>2. **VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT**<br>3. **BREACH OF WRITTEN CONTRACT**<br>4. **BREACH OF DUTY OF LOYALTY**<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff Glint Inc. ("Glint," "Plaintiff," or the "Company") for its Complaint against Defendants Perceptyx, Inc. ("Perceptyx"), Mitchell Anderson ("Anderson"), and DOES 1 through 10 (collectively "Defendants"), inclusive, allege as follows:

**INTRODUCTION**

1. This is an action regarding the brazen theft of Plaintiff's trade secret and confidential information by a former employee initiated weeks before his formal termination from Glint for his own benefit and that of his new employer, Perceptyx – a direct competitor of Glint.

2. Plaintiff Glint is a Delaware corporation headquartered in Redwood City, California. Since its formation in September 2013, Glint has invested millions of dollars developing its proprietary employee engagement platform that collects and leverages real-time employee data to aid large corporations in increasing employee engagement, job satisfaction and overall performance.

3. Defendant Anderson was hired at Glint in September 2016 as an enterprise account executive. He was employed from approximately September 2016 until May 1, 2018. For most of his tenure at Glint, Anderson underperformed, and was unable to meet his most basic sales goals. For the majority of the quarters that he was employed, he achieved well less than 20% of his bookings quota. Anderson's poor sales performance and inability to meet his bookings goals were addressed with him by Glint in November 2017.

4. By February 2018, after it had become clear that no amount of help or support from Glint management would assist Anderson in meeting basic bookings targets, Glint management informed Anderson that he would be given a final chance to demonstrate that he had the skills, ability and drive to meet his sales goals and close the deals assigned to him.

5. Shortly after that message was delivered in February 2018, rather than work on improving his job performance, Anderson began searching for alternative employment securing a new position as an enterprise account executive at Glint's direct competitor, Perceptyx.

6. On or about March 20, 2018, Anderson received an offer of employment from Perceptyx, but concealed this information from Glint, even after his formal notice of termination was delivered on or about April 14, 2018.

7. Post-termination forensic examination of his company-issued laptop revealed that between February 2018 and the last day of Anderson's employment on or about May 1, 2018, Anderson downloaded and transferred thousands of confidential and proprietary files regarding, among other information, product features and functionality, customer proposals, pricing and project implementation plans for customers and prospective customers in which Anderson had had no prior involvement.

8. Anderson's action included a high speed data transfer of approximately 3,500 files over a twenty minute period from the Company's secured G-Suite database on or about April 9, 2018 after he had already apparently accepted the competitor's job offer. His theft included bid packages on deals he had worked on in the past, but that had long since closed. These bid packages reveal Glint's product functionality, the positioning of its products relative to its competitors (including Perceptyx), and more. Other files include Company pricing tables, Glint's sales playbook (which includes a list of sales prospects), the Company's survey questions, screenshots of the Company's platform, and sales presentations given to customers.

9. Anderson had no legitimate reason for downloading these files, particularly in light of the fact that he had already secured a new position at Defendant Perceptyx and was leaving the Company.

10. With his performance continuing to fail and without knowing that Anderson had already received an offer of employment weeks earlier, Glint management informed Anderson on or about April 14, 2018 that he would be given thirty days to find alternative employment either within Glint or outside the Company. While the Company could have terminated him effective immediately, Glint wanted to give Anderson a chance to close two deals he was working on so that he would have the opportunity to receive commissions.

11. Anderson resigned from Glint effective May 1, 2018, approximately two weeks short of his thirty days' notice.

12. After resigning from Glint, Anderson immediately began work at Perceptyx assuming the same role he held at Glint as an enterprise account executive in the same or very similar sales territory.

13. Anderson's actions are in direct violation of the Glint Employee Invention Assignment and Confidentiality Agreement ("Confidentiality Agreement") he signed with the Company on or about September 26, 2016, as well as federal and state trade secret laws. A copy of the Confidentiality Agreement is attached hereto as **Exhibit A**.

14. Plaintiff brings this action to immediately enjoin Defendants from further misappropriation of Glint's trade secret and confidential information, to compel Anderson and his new employer to honor his confidentiality obligations and to mitigate the harm caused by Defendants' tortious conduct.

### THE PARTIES

15. Plaintiff Glint is a Delaware corporation with its principal place of business in Redwood City, California.

16. Upon information and belief, Defendant Perceptyx is a corporation incorporated in and existing under the laws of the State of California, with its principal place of business in Temecula, Riverside County, California.

17. Plaintiff is informed and believes, and on that basis alleges, that Anderson is a resident of Minneapolis, Minnesota and immediately began working for Perceptyx as an enterprise account executive following his termination from Glint.

18. Plaintiff is unaware of the true names and capacities of DOES 1-10, inclusive, but is informed and believes, and thereon alleges, that each of the DOE Defendants is responsible for the acts and obligations, and or should be subject to and bound by the declarations and judicial determinations sought herein. When Plaintiff learns the true names and capacities of DOE Defendants, it will amend this Complaint accordingly.

### VENUE AND JURISDICTION

19. This Court has subject matter jurisdiction over Glint's federal trade secret claim pursuant to 18 U.S.C. §§ 1836-39 *et seq.* and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

20. Venue is proper in this district under 28 U.S.C. § 1391(b), (c) and (d) based on the following:

a.  Plaintiff is informed and believes that Defendant Perceptyx conducts, engages in, and carries on business within the counties encompassed by the Northern District of California.

b.  A substantial part of the events or omissions giving rise to the claims made herein occurred, and a substantial part of the property that is the subject of this action is situated in one of the counties encompassed by the Northern District of California.

21. For purposes of intradistrict assignment under Local Rule 3-2, this action should be assigned on a district-wide basis.

## GENERAL ALLEGATIONS

### Background of Glint and Its Trade Secrets and Confidential Information

22. Glint has developed a people success platform that helps global organizations increase employee engagement, develop their people, and improve business results. Glint's software allows its enterprise customers the ability to see in real time how their employees feel about their jobs.

23. To do this, Glint has come up with a set of confidential and proprietary survey questions, which are known only to Glint and its customers. When a customer engages Glint, the Company sends the confidential survey questions to the customer's employees. Glint then uses its proprietary analytics to break down the data received from its customer's hundreds (and in many cases thousands) of employees to provide real-time feedback about employee engagement on a dashboard available only to its customers' managers and executives.

24. Founded in September 2013, Glint has enjoyed successful sales with a large customer base consisting of companies as small as brand new startups all the way to Fortune 100 companies.

25. Glint has spent millions of dollars and thousands of hours researching and developing its survey questions and software, as well as its marketing strategies for generating customer sales. These efforts include, but are not necessarily limited to, years of research and marketing, sales visits, attending trade shows, advertising, and seminars.

///

26. Glint has not and would not voluntarily permit a competitor to observe, let alone access, its confidential and proprietary survey questions, pricing information, tailored bids, sales presentations, and related information. Even Glint's bids and responses to requests for information denote that they are strictly confidential and may not be shared or distributed outside a customer's organization.

27. To protect its confidential and proprietary data, Glint takes numerous precautions to prevent unauthorized access to its files including: requiring employees to sign agreements with confidentiality provisions, and strictly limiting access to its survey questions, bids, sales presentations, and pricing information to sales employees.

28. When Glint provides its employees with Company-issued laptops, the Glint IT Department configures the laptop, encrypting the hard drive to ensure that the data remains private and secure. After the disk is encrypted, the IT Department installs anti-virus software and employs a firewall to block all ports, which provides protection against hackers. All passwords are sent to Glint employees using DataMotion, a security information transportation service that safeguards the passwords so that they cannot be intercepted by those without authorization.

29. Glint employees access their Gmail and G-Suite accounts through a two-factor authentication process. After entering their unique username and password, employees receive a unique, one-time code on their personal mobile phone or through an authenticator application. The employee receives an access code that must be entered into the system for every login from a non-Glint computer.

30. Glint employees using Salesforce access their accounts using Google tokens created in connection with the two-factor authentication process. The Salesforce application authenticates a Glint employee's credentials using the Google tokens, which are encrypted and stored inside the browser. The browser then provides the token each time Salesforce is accessed to verify the employee's identity before allowing access.

31. Glint's employees are forbidden from distributing its survey questions, pricing information, customer bids, sales presentations, or related information to anyone outside of the Company. If this information were to fall into a competitor's hands, the competitor would have

unfettered access to Glint's trade secret, confidential and highly proprietary survey questions, software, and business strategy. By receiving this information through Anderson, Perceptyx now has an opportunity to exploit the huge investment in time and money in developing Glint's platform, allowing it to analyze, break down, and review in detail what makes Glint unique among its competitors.

32. Obtaining a copy of the survey questions, pricing information, tailored bids, sales presentations, and related information would greatly benefit Plaintiff's competitors because it would allow them to peek under the hood to see exactly what they are competing against. With this information, a competitor could mimic Glint's proprietary survey questions and use the sales and pricing information to undercut Plaintiff's marketing strategy, which in turn would damage Glint's customer relationships and divert business away from Glint. By furnishing copies of thousands of pieces of highly sensitive sales and customer information, Perceptyx has an insider's perspective of Glint's product positioning, product know-how, and sales tactics that affords it an unfair advantage in closing competitive sales opportunities.

**Defendant Anderson and His Relationship with Glint**

33. On or about September 26, 2016, Anderson entered into the Confidentiality Agreement with Glint. In Section 1 of the Confidentiality Agreement, he acknowledged that:

> I understand that the Company is engaged in a continuous program of research, development, production and/or marketing in connection with its current and projected business and that it is critical for the Company to preserve and protect its proprietary information, its rights in certain inventions and works and in related intellectual property rights. Accordingly, I am entering into this Agreement, whether or not I am expected to create inventions or other works of value for the Company. As used in this Agreement, "Inventions" means inventions, improvements, designs, original works of authorship, formulas, processes, compositions of matter, computer software programs, databases, mask works, confidential information and trade secrets.

34. Under the terms of the Confidentiality Agreement, Anderson agreed that his employment with Glint created a relationship of confidence and trust with respect to Plaintiff's confidential and secret information. Section 8 of the Confidentiality Agreement provides that:

> I understand that my employment by the Company creates a relationship of confidence and trust with respect to any information or materials of a confidential or secret nature that may be made, created or discovered by me or that may be

disclosed to me by the Company or a third party in relation to the business of the Company or to the business of any parent, subsidiary, affiliate, customer or supplier of the Company, or any other party with whom the Company agrees to hold such information or materials in confidence (the "Proprietary Information"). Without limitation as to the forms that Proprietary Information may take, I acknowledge that Proprietary Information may be contained in tangible material such as writings, drawings, samples, electronic media, or computer programs, or may be in the nature of unwritten knowledge or know-how.  Proprietary Information includes, but is not limited to, Assigned Inventions, marketing plans, product plans, designs, data, prototypes, specimens, test protocols, laboratory notebooks, business strategies, financial information, forecasts, personnel information, contact information, customer and supplier lists, and the non-public names and addresses of the Company's customers and suppliers, their buying and selling habits and special needs.

35. Anderson also agreed that he would return all Proprietary Information to Plaintiff upon terminating his employment. Specifically, under section 9 of the Confidentiality Agreement, he agreed as follows:

At all times, both during my employment and after its termination, I will keep and hold all Proprietary Information in strict confidence and trust.  I will not use or disclose any Proprietary Information without the prior written consent of the Company in each instance, except as may be necessary to perform my duties as an employee of the Company for the benefit of the Company.  Upon termination of my employment with the Company, <u>I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, and I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information</u>.

### Anderson's Departure from Glint to Join Perceptyx

36. By November 2017, Anderson was not meeting his employer's expectations in terms of his performance and sales goals.  Glint management provided him numerous opportunities to improve, but Anderson continued to be unsuccessful.

37. In February 2018, after it was clear that no amount of help or support from Glint management could assist Anderson in meeting his most basic revenue goals, Glint sales management team told Anderson that he would be given a final chance to demonstrate that he did, in fact, have the skills and ability to meet his sales goals and that he could close the deals assigned to him.

38. Shortly after that conversation in February 2018, Glint is informed and believes that, rather than improve his performance at Glint, Anderson began traveling to and interviewing for an enterprise account executive position at Perceptyx.

39. On or about April 14, 2018, Plaintiff's Regional Vice President of Sales – West, Anderson's immediate supervisor, David Haskell, informed Anderson that he would have thirty days to find another position either within Glint or with another company.

40. Anderson subsequently announced his resignation from Glint. When asked by Haskell where he would be working after Glint, Anderson refused to disclose that information.

41. During the last week of Anderson's employment, after Glint told him he would need to find a new position, Marc Maloy, Glint's Chief Revenue Officer, reminded Anderson that he was still bound by his Confidentiality Agreement and advised him not to take any confidential or proprietary data of Glint with him when he departed. Anderson promised Maloy that he had not done so and would not do so.

**Anderson's Misappropriation of Glint's Confidential and Proprietary Information**

42. In early May 2018, another Glint employee brought to Haskell's attention that, during the last week of April 2018, this person noticed that Anderson had been looking at the file containing Glint's proprietary survey questions. Haskell found this suspicious, as there was no need for Anderson to have been reviewing the survey questions for the work he was performing during his last week of employment.

43. On or about May 7, 2018, Glint's General Counsel sent Anderson a letter reminding him of his confidentiality obligations and requesting that any Company information retained by Anderson be immediately returned.

44. Concurrently, Glint undertook the necessary steps to inspect Anderson's company-issued laptop.

45. Glint then discovered for the first time that Anderson had accessed and downloaded numerous highly confidential and proprietary Glint files, including, but not limited to, confidential competitive bid packages in which he had no involvement whatsoever as well as other bids that had since been reassigned to his colleagues and/or related to past deals. These bid packages reveal Glint's product functionality, the positioning of its products relative to its competitors (including Perceptyx), and more. Other files he accessed and downloaded include Company pricing tables, Glint's sales playbook (which includes a list of sales prospects), the

FENWICK & WEST LLP
ATTORNEYS AT LAW

Company's survey questions, screenshots of the Company's platform, and numerous proposals made to customers.

46. Glint has since come to learn that the unauthorized access and download of its Proprietary Information occurred from Minnesota, where Anderson lives, with further attempts made in the Los Angeles and Temecula, California, where Perceptyx maintains its headquarters, at a time when Anderson was in Southern California. Glint's access log further shows that Anderson attempted to log into Glint's systems from an unauthorized non-Glint computer.

47. Upon learning of these issues, on or about May 10, 2018, Maloy phoned Anderson and asked him for an explanation as to why he had downloaded Glint's proprietary and confidential information. Anderson promised Maloy, swearing "to God" and "on his life" that he had not taken any of Glint's confidential or proprietary information.

48. A few days later, Anderson texted and called Maloy on or about May 12, 2018, telling Maloy that he was "really freaking out" and again promising that he had not retained any Glint confidential or proprietary information. He also promised to Glint's CRO that he had not attempted to pursue any of the customers he had pursued on behalf of Glint.

49. Despite these assurances, Glint's customer and prospective customer opportunities in which Anderson had assisted went dark. Customers and prospects suddenly and unexpectedly stopped answering calls by Glint sales personnel, when before they had been engaging in active discussions and even setting up meetings that they subsequently canceled following Anderson's departure.

50. Glint also uncovered proof that Anderson was actively soliciting Glint's customers days after promising he had not and would not engage in such activity. As shown below, the customer responded to an affirmative solicitation from Anderson's Perceptyx e-mail address, accidentally addressing the response to Anderson's Glint e-mail address, which was forwarded automatically to Haskell. The email clearly establishes that Anderson misrepresented himself and engaged in false statements when he assured his former employer that he was not exploiting its confidential, insider information to counter sell against Glint.

///

> From: Mitch Anderson [mailto:manderson@perceptyx.com]
> Sent: Monday, May 07, 2018 5:47 PM
> To: ▇▇▇▇▇▇▇▇▇▇
> Cc: Josh Markle
> Subject: Can I help in your evaluation?
>
> Hi ▇▇▇▇▇
> I hope that you are well! Apologies for the hasty departure note two weeks ago, but I trust that you are being taken care of by my replacement.
> You can now see that I've made the jump to Perceptyx and I was happy to hear that Josh has already connected with you. Let me know if I can be helpful in your employee engagement evaluation. Feel free to use me as a resource should you have questions and I can illuminate the big differences (and potential blind spots) for ▇▇▇▇▇. I can also share with you some of the reasons why I made the career move to join this great company.
> Let me know if you are available to connect this week.
> Best regards,
> Mitch
>
> **Mitch Anderson**
> Enterprise Account Executive
> Perceptyx
> p: 402.540.4059
> e: manderson@perceptyx.com
> w: www.perceptyx.com

51. On May 11, 2018, Glint's outside counsel sent Anderson and Perceptyx a cease and desist letter requesting that they identify and return Glint's confidential and proprietary data.

52. In response to this second request for return of company property, Anderson wrote back to Glint's outside counsel on May 14, 2018, contradicting his earlier assurances and admitting for the first time that, despite having told Maloy that he had not retained any Glint confidential or proprietary information, he maintained in his possession "pitch decks, RFP's, sales training manuals, pricing scenarios, territory plans, and marketing materials," which he was allegedly shipping back to Glint. This is in direct contrast to the representations he had made earlier to Maloy that he had retained no such data in any form and categorically denied any wrongdoing.

53. On May 15, 2018, Perceptyx sent its written response, which also categorically denied having or using Glint's confidential and/or proprietary information.

54. In the face of these categorical denials and meaningless assurances, Glint was left with no other choice but to proceed with this action.

///

///

///

**FIRST CAUSE OF ACTION: VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT**

**(18 U.S.C. §§ 1836 *et seq.*)**
**(Against all Defendants)**

55. Plaintiff incorporates by reference the preceding paragraphs 1 through 54 as though fully stated herein.

56. As a result of the substantial investment therein, Plaintiff has created trade secret information within the meaning of the federal Defend Trade Secrets Act, including numerous bid packages revealing Glint's product functionality and the positioning of its products relative to its competitors (including Perceptyx), Company pricing tables, Glint's sales playbook (which includes a list of sales prospects), the Company's survey questions, the design of the Company's platform, and numerous sales presentations. Such information constitutes trade secret information because it derives actual and potential economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. As set forth herein, such information has been the subject of efforts that were reasonable under the circumstances to maintain its secrecy.

57. Plaintiff's trade secrets relate to the Company's products and services, which are used and sold, or intended to be used and sold, in interstate or foreign commerce.

58. Plaintiff's trade secrets have economic value because they enable Plaintiff to compete in the marketplace and to generate sales. Glint has expended great efforts and expense to develop bid packages, Company pricing tables, Glint's sales playbook (which includes a list of sales prospects), the Company's survey questions, the Company's platform, and its sales presentations.

59. Anderson, Perceptyx, and DOES 1-10, by the acts alleged herein, have misappropriated Plaintiff's trade secrets in violation of the Defend Trade Secrets Act, entitling Glint to injunctive relief and damages.

60. As a direct and proximate result of Defendants' misappropriation of trade secrets, Plaintiff has suffered actual damages in an amount to be proven at trial. In addition, Perceptyx and DOES 1-10 have been unjustly enriched.

61. On information and belief, in misappropriating Plaintiff's trade secrets, Defendants acted willfully and maliciously, justifying an award of exemplary damages from Anderson, Perceptyx, and DOES 1-10. Plaintiff is also entitled to recover from Anderson, Perceptyx, and DOES 1-10 its attorneys' fees and costs incurred in this action.

62. As a direct and foreseeable result of Defendants' misappropriations of trade secrets, Plaintiff has suffered and will continue to suffer irreparable harm, including but not limited to further misappropriation of its trade secrets and Defendants' further exploitation of Plaintiff's trade secrets and a loss of its competitive advantage. Plaintiff is informed and believes, and based thereon alleges, that unless Defendants are enjoined, they will continue to inflict great and irreparable harm, including the further misappropriation of Plaintiff's trade secrets. Plaintiff's remedy at law is not by itself adequate to compensate them for the harm inflicted by Defendants. Accordingly, Plaintiff is entitled to injunctive relief.

### SECOND CAUSE OF ACTION: VIOLATION OF THE CALIFORNIA UNIFORM TRADE SECRETS ACT

**(Cal. Civ. Code §§ 3426 *et seq.*)**
**(Against all Defendants)**

63. Plaintiff incorporates by reference the preceding paragraphs 1 through 54 as though fully stated herein.

64. As a result of the substantial investment therein, Plaintiff has created trade secret information within the meaning of California Civil Code Section 3426.1(d), including bid packages revealing Glint's product functionality and the positioning of its products relative to its competitors (including Perceptyx), Company pricing tables, Glint's sales playbook (which includes a list of sales prospects), the Company's survey questions, the design of the Company's platform, and numerous sales presentations  Such information constitutes trade secret information because it derives actual and potential economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. As set forth herein, such information has been the subject of efforts that were reasonable under the circumstances to maintain its secrecy.

///

65. Plaintiff's trade secrets had and have economic value because they enable Plaintiff to compete in the marketplace and to generate sales. Glint has expended great efforts and expense to develop its bid packages, Company pricing tables, Glint's sales playbook (which includes a list of sales prospects), the Company's survey questions, the Company's platform, and numerous sales presentations.

66. Anderson, Perceptyx, and DOES 1-10, by the acts alleged herein, have misappropriated Plaintiff's trade secrets in violation of the California Uniform Trade Secrets Act, California Civil Code Section 3426 *et seq.,* entitling Glint to injunctive relief and damages.

67. As a direct and proximate result of Defendants' misappropriation of trade secrets, Plaintiff has suffered actual damages in an amount to be proven at trial. In addition, Anderson, Perceptyx, and DOES 1-10 have been unjustly enriched. Plaintiff is, therefore, entitled to recover compensatory damages and restitution from them in an amount to be determined at trial.

68. On information and belief, in misappropriating Plaintiff's trade secrets, Defendants acted willfully and maliciously, justifying an award of exemplary damages from Anderson, Perceptyx, and DOES 1-10 of twice Plaintiff's actual damages pursuant to California Civil Code Section 3426.3(c). Plaintiff is also entitled to recover from Anderson, Perceptyx, and DOES 1-10 its attorneys' fees and costs incurred in this action.

69. As a direct and foreseeable result of Defendants' misappropriations of trade secrets, Plaintiff has suffered and will continue to suffer irreparable harm, including but not limited to further misappropriation of its trade secrets and Defendants' further exploitation of Plaintiff's trade secrets and a loss of its competitive advantage. Plaintiff is informed and believes, and based thereon alleges, that unless Defendants are enjoined, they will continue to inflict great and irreparable harm, including the further misappropriation of Plaintiff's trade secrets. Plaintiff's remedy at law is not by itself adequate to compensate them for the harm inflicted by Defendants. Accordingly, Plaintiff is entitled to injunctive relief.

///

///

///

### THIRD CAUSE OF ACTION: BREACH OF CONTRACT
**(Against Defendant Anderson)**

70. Plaintiff incorporates by reference the preceding paragraphs 1 through 54 as though fully stated herein.

71. On or about September 26, 2016, Anderson entered into a valid contract, the Confidentiality Agreement, with Glint.

72. Plaintiff has performed all of its obligations with regard to the Confidentiality Agreement, except any acts excused by Anderson's breach of that contract.

73. The Confidentiality Agreement obligated Anderson to (1) keep in confidence and trust all of Glint's Proprietary Information, (2) refrain from using or disclosing Glint's Proprietary Information without written consent from the Company, and (3) return to Glint all of the Company's proprietary and confidential information upon his resignation.

74. In taking the actions more fully described above, Anderson materially breached the Confidentiality Agreement by failing to perform his obligations thereunder, in that, inter alia, (1) he failed to hold Plaintiff's Proprietary Information in confidence; (2) he disclosed and/or used Plaintiff's Proprietary Information for his own benefit and for the benefit of Perceptyx; and (3) he failed to return all of Plaintiff's Proprietary Information.

75. As a direct and proximate result of Anderson's breach of contract, Glint has been damaged in an amount to be determined at trial.

76. As a direct and foreseeable result of Anderson's breach of contract, Plaintiff has suffered and will continue to suffer irreparable harm, including but not limited to further misappropriation of its trade secrets and/or confidential information and Anderson's further exploitation of Plaintiff's trade secrets and confidential information. Plaintiff is informed and believes, and based thereon alleges, that unless he is enjoined, Anderson will continue to inflict great and irreparable harm, including further breaches of his confidentiality obligations to Plaintiff. Glint's remedy at law is not by itself adequate to compensate it for the harm inflicted by Anderson. Accordingly, Plaintiff is entitled to injunctive relief.

///

## FOURTH CAUSE OF ACTION: BREACH OF THE DUTY OF LOYALTY
### (Against Defendant Anderson)

77. Plaintiff incorporates by reference the preceding paragraphs 1 through 54 as though fully stated herein.

78. By virtue of his employment with Glint, Anderson owed Glint a duty of loyalty.

79. The California Labor Code provides, "An employee who has any business to transact on his own account, similar to that entrusted to him by his employer, shall always give the preference to the business of the employer." Cal. Lab. Code § 2863.

80. Upon information and belief, during the last week of his employment with Glint, Anderson solicited, for his own benefit and the benefit of Perceptyx, at least three customers he was originally pursuing on behalf of Glint.

81. As a direct and foreseeable result of Anderson's breach of his duty of loyalty to Glint, the Company has suffered and will continue to suffer irreparable harm, including but not limited to further loss of Plaintiff's competitive advantage. Plaintiff is informed and believes, and based thereon alleges, that unless Anderson is enjoined, he will continue to inflict great and irreparable harm, including the further solicitation of Glint customers using Glint's Proprietary Information. Plaintiff's remedy at law is not by itself adequate to compensate it for the harm inflicted by Anderson. Accordingly, Glint is entitled to injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE,** as a result of the foregoing, Plaintiff Glint Inc. prays for relief as follows:

1. A temporary restraining order and preliminary and permanent injunctions enjoining and restraining Defendants from engaging in, committing or performing, directly or indirectly, any and all of the following acts:

    a. Enjoin Defendants Anderson, Perceptyx, and all officers, directors, employees, agents, or persons acting for or on behalf of Defendants, from further disclosing and/or using any confidential and/or trade secret information developed by Plaintiff and misappropriated by Defendants;

      b.     Require Defendants to deliver to Plaintiff or this Court all property, documents, materials or other things in Defendants' possession, which embody, contain, or reference Glint's confidential and/or trade secret information; and

      c.     Provide a full accounting of all Glint property in Defendants' possession, custody or control following termination of Anderson's employment with Plaintiff;

2. Recovery of actual damages from Defendants according to proof at trial;

3. Recovery of restitution from Defendants in an amount to be determined at trial, and/or any interest in money or property, which may have been acquired by means of Defendants' misappropriation of trade secrets, unfair competition or other unlawful acts;

4. An award of punitive damages from all Defendants;

5. An award of exemplary damages pursuant to California Civil Code Section 3426.3(c) from all Defendants;

6. An award of attorneys' fees and costs incurred in connection with this action; and

7. Such other and further relief as the Court deems just and proper.

Dated: May 16, 2018          FENWICK & WEST LLP

By:  */S/ Patrick E. Premo*
      Patrick E. Premo

Attorneys for Plaintiff
GLINT INC.

## JURY DEMAND

Plaintiff Glint asserts its right to a trial by jury and demands a jury trial on all causes of action so triable. Plaintiff Glint will tender any required jury fee.

Dated: May 16, 2018          FENWICK & WEST LLP

By:  */S/ Patrick E. Premo*
      Patrick E. Premo

Attorneys for Plaintiff
GLINT INC.