PATRICK E. PREMO (CSB No. 184915)
ppremo@fenwick.com
SHEEVA J. GHASSEMI-VANNI (CSB No. 246639)
sghassemi@fenwick.com
JOHN-PAUL S. DEOL (CSB No. 284893)
jpdeol@fenwick.com
TIARA R. QUINTANA (CSB No. 315783)
tquintana@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone:    650.988.8500
Facsimile:    650.938.5200

Attorneys for Plaintiff
GLINT INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLINT INC., a Delaware corporation, | CASE NO. 3:18-CV-02886-CRB |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF GLINT INC.'S EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED DISCOVERY** |
| v. | |
| PERCEPTYX, INC., a California corporation; MITCHELL ANDERSON, an individual; and DOES 1 through 10, inclusive, | |
| Defendants. | |

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................................. 1

STATEMENT OF FACTS ............................................................................................................... 2

    I.    GLINT'S PRODUCTS AND SERVICES ................................................................ 2

    II.    GLINT'S TRADE SECRETS .................................................................................. 2

    III.    GLINT'S PROTECTION OF ITS TRADE SECRETS ........................................... 3

    IV.    ANDERSON'S CONNECTIONS TO PERCEPTYX PRE-DATE HIS EMPLOYMENT WITH GLINT ................................................................................. 4

    V.    ANDERSON'S EMPLOYMENT AND CONFIDENTIALITY OBLIGATIONS TO GLINT ....................................................................................... 4

    VI.    ANDERSON'S POOR PERFORMANCE AT GLINT ........................................... 5

    VII.    ANDERSON'S CONDUCT RAISES GLINT'S SUSPICIONS ............................. 6

    VIII.    GLINT CONTACTS ANDERSON AND PERCEPTYX TO NO AVAIL .................................................................................................................... 7

    IX.    GLINT IS FORCED TO ENGAGE COMPUTER FORENSICS EXPERTS ................................................................................................................. 8

    X.    GLINT RECEIVES E-MAILS DEMONSTRATING THAT ANDERSON AND PERCEPTYX ARE USING GLINT'S PROPRIETARY INFORMATION ...................................................................... 8

ARGUMENT ................................................................................................................................... 8

    I.    EVIDENCE UNCOVERED TO DATE DEMONSTRATES GLINT WILL SUCCEED ON THE MERITS OF ALL ITS CLAIMS .............................. 9

        A.    Glint is Likely to Succeed on the Merits of Its Trade Secrets Claims Under the DTSA and the CUTSA ............................................... 9

        B.    Glint is Likely to Succeed on the Merits of Its Breach of Written Contract and Breach of Loyalty Claims ........................................ 12

    II.    GLINT IS LIKELY TO SUFFER IRREPARABLE AND IMMEDIATE INJURY IN THE ABSENCE OF SWIFT INJUNCTIVE RELIEF. ............................................................................................ 13

    III.    THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN FAVOR OF THE TRO ............................................................................................................ 14

    IV.    THE COURT SHOULD GRANT TARGETED EXPEDITED DISCOVERY ............................................................................................................ 14

CONCLUSION .............................................................................................................................. 15

FENWICK & WEST LLP
ATTORNEYS AT LAW

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)..................................................................................................9

*Bancroft-Whitney Co. v. Glen*,
64 Cal. 2d 327 (1966) ............................................................................................................12

*Bank of Am., N.A. v. Lee*,
No. CV 08-5546 CAS, 2008 WL 4351348 (C.D. Cal. Sept. 22, 2008) ..................................11

*Brocade Comm. Sys. Inc. v. A10 Networks, Inc.*,
873 F. Supp. 2d 1192, 1214 (N.D. Cal. 2012) .......................................................................10

*California v. Tahoe Regional Planning Agency*,
766 F.2d 1319 (9th Cir. 1985)................................................................................................14

*Fowler v. Varian Assoc.*,
196 Cal. App. 3d 34 (1987) ...................................................................................................12

*Gallagher Benefit Servs., Inc. v. De La Torre*,
283 F. App'x 543 (9th Cir. 2008) ..........................................................................................13

*Gallagher Benefits Servs., Inc. v. De La Torre*,
No. C 07-5495 VRW, 2007 WL 4106821 (N.D. Cal. Nov. 16, 2007) ...................................13

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009)................................................................................................14

*Lillge v. Verity*,
No. C 07–2748, 2007 WL 2900568 (N.D. Cal. Oct. 2, 2007) ...............................................13

*MAI Systems Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993)..................................................................................................10

*Markovits v. Venture Info Capital, Inc.*,
129 F. Supp. 2d 647 (S.D.N.Y. 2001) ....................................................................................13

*Morlife, Inc. v. Perry*,
56 Cal. App. 4th 1518, 1520 (1997) ................................................................................10, 11

*Oculus Innovative Scis., Inc. v. Nofil Corp.*,
No. C 06-1686-SI, 2007 WL 4044867 (N.D. Cal. Nov. 15, 2007) ........................................12

*Physicians Interactive v. Lathian Sys.*,
No. CA-03-1193-A, 2003 U.S. Dist. LEXIS 22868 (E.D. Va. Dec. 5, 2003) ........................15

*Pod-Ners, LLC v. Northern Feed & Bean*,
204 F.R.D. 675 (D. Colo. 2002).............................................................................................15

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*PQ Labs, Inc. v. Yang Qi*,
  No. 12-0450 CW, 2014 WL 4954161 (N.D. Cal. Sept. 30, 2014) ................................................ 10

*Reeves v. Hanlon*,
  33 Cal. 4th 1140 (2004) .............................................................................................................. 12

*Religious Technology Center v. Netcom On-Line Communications Services, Inc.*,
  923 F. Supp. 1231 (N.D. Cal. 1995) ........................................................................................... 11

*Semitool v. Tokyo Electron Am., Inc.*,
  208 F.R.D. 273 (N.D. Cal. 2002) ................................................................................................ 14

*Stuhlbarg Int'l Sales Co., v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) ...................................................................................................... 13

*TMX Funding, Inc. v. Impero Techs., Inc.*,
  No. C. 10–00202 JF (PVT), 2010 WL 1028254 (N.D. Cal. Mar. 18, 2010) .............................. 13

*Whyte v. Schalge Lock Co.*,
  101 Cal. App. 4th 1443 (2002) ................................................................................................... 11

*Xantrex Tech. Inc. v. Advanced Energy Indus.*,
  No. 07-02324, 2008 U.S. Dist. LEXIS 41206 (D. Colo. May 23, 2008) ................................... 14

**STATUTES**

18 U.S.C. § 1836(b)(3)(A) (Defend Trade Secrets Act ("DTSA")) ..................................... *passim*

Cal. Civ. Code § 3426.1(d) ....................................................................................................... 9, 11

Cal. Civ. Code § 3426.1(d)(1) ....................................................................................................... 11

Cal. Civ. Code § 3426.2 ("CUTSA") ..................................................................................... *passim*

Cal. Civ. Code § 3426.2(a) ............................................................................................................ 12

**RULES**

Fed. R. Civ. P. 65(b) ....................................................................................................................... 9

**OTHER AUTHORITIES**

4 Wilcox, California Employment Law, § 70.10 .......................................................................... 12

James Pooley, Trade Secrets (2009) § 4.02[2][a] (citing Restatement (Third) of
  Unfair Competition § 42, comment f (1995)) ............................................................................. 9

FENWICK & WEST LLP
ATTORNEYS AT LAW

# INTRODUCTION

This motion for a temporary restraining order and expedited discovery seeks to alleviate the immediate harm caused by the brazen theft of Plaintiff Glint Inc.'s ("Glint," "Plaintiff," or the "Company") trade secret and confidential information by former employee, Defendant Mitchell Anderson ("Anderson"). Anderson began his data grab of thousands of highly sensitive, confidential sales and marketing files, including sales playbooks (that include sales prospects), pricing strategies, a pricing calculator, customized bids for prospective customer he never worked on, customer action plans, and screenshots of the Company's platform, among other files, after he had secretly made the decision to go to work for Glint's competitor, Defendant Perceptyx, Inc. ("Perceptyx") made multiple pre-filing attempts with Defendants to resolve this dispute, but was met with categorical denials and a refusal to cooperate at any level to investigate, sequester or remove the files. In the short amount of time since Anderson left his position, Glint is already experiencing an immediate impact with a number of customer deals abruptly and atypically terminating in the short time since Anderson began working at Perceptyx.

The sheer volume of electronic data that was accessed and downloaded by Anderson at a time he had no legitimate reason to access the documents in quest, his categorical denials that he did anything improper in the face of forensic evidence to the contrary, and the effect already felt in the marketplace, left Glint with no option but to seek relief directly with the Court.

Anderson's bad acts, and Perceptyx's failure to prevent and to continue benefitting from the same, constitute misappropriation of trade secrets under both the federal Defend Trade Secrets Act ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA"), material breach of Anderson's Employee Invention Assignment and Confidentiality Agreement and Anderson's breach of his duty of loyalty to the Company. Given the fact that the files are unquestionably the property of Glint, the balance of hardships tips decidedly in favor of Plaintiff with little impact to Defendants, who have no right to possess, use or profit from the theft. Glint's request for provisional relief and early discovery is aimed at halting the misappropriation, mitigating Glint's harm, and ensuring that its terminated employee and direct competitor no longer benefit from the bad acts.

FENWICK & WEST LLP
ATTORNEYS AT LAW

MPA ISO GLINT'S EX PARTE MOTION FOR
RESTRAINING ORDER AND EXPEDITED DISCOVERY          1          CASE NO. 3:18-CV-02886-CRB

# STATEMENT OF FACTS

## I. GLINT'S PRODUCTS AND SERVICES

Since its formation in September 2013, Glint has invested millions of dollars developing its proprietary employee engagement software platform that collects and leverages real-time employee data to aid large corporations in increasing employee engagement, job satisfaction and overall performance. (Declaration of David Haskell ("Haskell Decl."), ¶ 5.) This allows businesses to increase employee engagement, develop their people, and improve business results. (*Id.*) In addition to its software, Glint has developed survey questions that it provides to its customers' employees containing proprietary open-ended and close-ended questions. (*Id.* at ¶ 6.) Glint's proprietary software then analyzes the responses of each customers' hundreds or thousands of employees in real time to provide immediate feedback to the customers' management team, who has access to a personalized dashboard only visible to them. (*Id.*) This process (including the dashboard Glint has created) allows the Company's customers to assess the engagement and satisfaction of their workforce and make decisions based on the response data obtained from their employees. (*Id.*)

Based on its investments, its research and analysis, Glint has arrived at a set of proprietary survey questions that are stored in Google Drive and only accessible to those Glint employees who need to know and who are given the appropriate login credentials. (*Id.* at ¶ 7.)

## II. GLINT'S TRADE SECRETS

Glint's goal is to tailor its product to the needs of each customer, whether that be through competitive pricing, customized survey questions, a customized dashboard, or customized feedback. (*Id.* at 9.) To remain competitive, Glint spends thousands of hours and millions of dollars researching and creating trade secrets, which were misappropriated by Anderson, including:

1. Unique survey questions;
2. Confidential bids, which reveal Glint's product functionality, the positioning of its products relative to its competitors (including Perceptyx), and tailored pricing;
3. Sales playbooks containing pricing tables and a list of potential customer leads;

FENWICK & WEST LLP
ATTORNEYS AT LAW

    4. Tailored sales presentations; and

    5. Benchmarking data, which the Company uses to help customers understand what their level of employee engagement should be compared to other companies.

(*Id.* at ¶¶ 10-12.)  Only employees who need to know have access to these files.  (*Id.* at ¶ 10.)  Customers and Glint understand that any sales information distributed to customers is understood to be confidential and is frequently subject to non-disclosure agreements.  (*Id.* at ¶ 10.)

       The Company pricing tables, Glint's sales playbook (which includes a list of sales prospects), the Company's survey questions, screenshots of the Company's platform, and sales presentations given to customers would allow a competitor the opportunity to analyze, break down, and review in detail what makes Glint unique among its competitors.  (*Id.* at ¶¶ 10-12.)  Obtaining a copy of this information would greatly benefit the Company's competitors because it would allow them to see exactly what they are competing against.  (*Id.* at ¶ 13.)  With this information, a competitor could mimic Glint's proprietary survey questions and use the sales and pricing information to undercut the Company's marketing strategy, which in turn would damage Glint's customer relationships and divert business away from Glint.  (*Id.* at ¶¶ 14-15.)  Thus, these documents and the data mentioned above would, in the wrong hands, cause Glint irreparable harm.  (*Id.*)

**III.   GLINT'S PROTECTION OF ITS TRADE SECRETS**

       Glint is extraordinarily diligent in undertaking the necessary steps to protect its confidential, proprietary, and trade secret information.  When Glint provides its employees with laptops, its IT team carefully configures the laptop.  (Declaration of Anita Carey ("Carey Decl."), ¶ 5.)  As part of the configuration, the IT team first encrypts the hard drive to ensure that the data on the device remains private and secure.  (*Id.*)  After the disk is encrypted, the team installs anti-virus software and employs a firewall to block all ports, which provides protection from remote hackers.  (*Id.*)  In order to secure the encryption keys, all passwords are sent to Glint employees using DataMotion, a security information transportation service that safeguards the security of those passwords so that no one else can intercept them.  (*Id.*)  Most of Glint's files, including its survey questions and sales files, are stored using Google Drive.  (*Id.* at ¶ 7.)  Glint employees

access their Gmail and G-Suite accounts through a two-factor authentication process. (*Id.* at ¶ 8.) First, an employee creates and enters his or her username and password. (*Id.*) Second, the employee receives a unique, one-time code on his or her personal mobile phone or through an authenticator application. (*Id.*) Using both methods, the employee receives an access code that must be entered into the system for every login from a non-Glint computer. (*Id.*) This method of securing Glint's data makes it almost impossible for someone without permission to gain access to the Company's data. (*Id.* at ¶ 10.)

## IV. ANDERSON'S CONNECTIONS TO PERCEPTYX PRE-DATE HIS EMPLOYMENT WITH GLINT

Even before joining Glint, Anderson wanted to work for Perceptyx. One of his friends, Chad Tonniges, Perceptyx's Senior Vice President of Business Development, connected him with Perceptyx's co-founder, Jack Morehouse, to discuss a potential position at Perceptyx. A July 18, 2016 e-mail chain stored on Anderson's Glint computer indicates that, while employed as a salesperson for IBM, Anderson connected with Morehouse at a conference in Denver, Colorado to discuss potential employment at Perceptyx. (Declaration of Mark Eskridge ("Eskridge Decl."), ¶ 20, Ex. C.) In that e-mail exchange, Anderson expressed concern that his IBM colleagues would discover his intentions of seeking new employment. (*Id.*) Morehouse agreed that the two "need to be discreet" in where and when to meet. (*Id.*)

## V. ANDERSON'S EMPLOYMENT AND CONFIDENTIALITY OBLIGATIONS TO GLINT

On or about September 19, 2016, Anderson began employment with Glint as an enterprise account executive. (Haskell Decl., ¶ 17.) Anderson worked from his home in Minneapolis, Minnesota. (*Id.* at ¶ 16.) Given the sensitivity of Glint's proprietary, confidential, and trade secret information, Glint and Anderson entered into a Glint Employee Invention Assignment and Confidentiality Agreement ("Confidentiality Agreement"). (*Id.* at ¶ 18, Ex. C.) In Section 1 of the Confidentiality Agreement, he acknowledged that:

> I understand that the Company is engaged in a continuous program of research, development, production and/or marketing in connection with its current and projected business and that it is critical for the Company to preserve and protect its proprietary information, its rights in certain inventions and works and in related intellectual property rights.

FENWICK & WEST LLP
ATTORNEYS AT LAW

(*Id.*) Anderson further agreed that his employment with Glint created a relationship of confidence and trust with respect to Plaintiff's confidential and secret information. Section 8 of the Confidentiality Agreement provides that:

> I understand that my employment by the Company creates a relationship of confidence and trust with respect to any information or materials of a confidential or secret nature that may be made, created or discovered by me or that may be disclosed to me by the Company or a third party in relation to the business of the Company or to the business of any parent, subsidiary, affiliate, customer or supplier of the Company, or any other party with whom the Company agrees to hold such information or materials in confidence (the "Proprietary Information"). Without limitation as to the forms that Proprietary Information may take, I acknowledge that Proprietary Information may be contained in tangible material such as writings, drawings, samples, electronic media, or computer programs, or may be in the nature of unwritten knowledge or know-how. Proprietary Information includes, but is not limited to, Assigned Inventions, marketing plans, product plans, designs, data, prototypes, specimens, test protocols, laboratory notebooks, business strategies, financial information, forecasts, personnel information, contact information, customer and supplier lists, and the non-public names and addresses of the Company's customers and suppliers, their buying and selling habits and special needs.

(*Id.*)

Anderson also agreed that he would return all Proprietary Information upon termination:

> At all times, both during my employment and after its termination, I will keep and hold all Proprietary Information in strict confidence and trust. I will not use or disclose any Proprietary Information without the prior written consent of the Company in each instance, except as may be necessary to perform my duties as an employee of the Company for the benefit of the Company. Upon termination of my employment with the Company, <u>I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, and I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information</u>.

(*Id.*)

## VI. ANDERSON'S POOR PERFORMANCE AT GLINT

After working with Anderson for some time, it became clear to his immediate supervisor, Regional Vice President of Sales – West, David Haskell in late 2017 that Anderson did not have the skills, aptitude or drive required to succeed at Glint. (*Id.* at ¶ 19.) In February, 2018, Haskell told Anderson that his performance would need to improve and that he would need to meet his sales goals for the first quarter of 2018. (*Id.* at ¶ 20.) Anderson had not met his sales goals for the last quarter of 2017, nor did he meet them for the first quarter of 2018. (*Id.* at ¶ 21.) On or about April 14, 2018, Haskell told Anderson that he would need to find another job, either in a

FENWICK & WEST LLP
ATTORNEYS AT LAW

different role at Glint, or with another company.  (*Id.* at ¶ 22.)

Haskell told Anderson that he could have thirty days to find a new job.  (*Id.* at ¶ 23.) Glint generously offered to keep him on payroll, to let him work on two ongoing deals and allow him the opportunity to earn commissions on those two deals.  (*Id.*)  Anderson would otherwise transition all other matters to other Glint sales team members.  (*Id.*)

During the last week of April, 2018, Anderson came to Haskell and told him that he had found another position outside of Glint.  (*Id.* at ¶ 24.)  When Haskell asked him where he was going, Anderson refused to tell him.  During the last week of Anderson's employment, Marc Maloy, Glint's Chief Revenue Officer, reminded Anderson that he was still bound by his Confidentiality Agreement and advised him not to take any confidential or proprietary data with him when he departed.  (Declaration of Marc Maloy ("Maloy Decl."), ¶ 5.)  Anderson promised that he had not and would not do so.  (*Id.*)

## VII. ANDERSON'S CONDUCT RAISES GLINT'S SUSPICIONS

Defendant Anderson's last day of employment with Glint was May 1, 2018.  (Haskell Decl., ¶ 26.)  On or about May 3, 2018, one of the enterprise account executives on Haskell's team, Cassidy Shore, told Haskell that during the last few days of April, 2018, she was reviewing Glint's survey questions in Google Drive and noticed Anderson was simultaneously reviewing the survey questions.  (*Id.* at ¶ 27.)  Anderson had no need to view Glint's survey questions so close to his separation from employment with Glint and was doing no work that required access to those questions.  (*Id.*)  On or about May 7, 2018, Glint's General Counsel sent Anderson a letter reminding him of his confidentiality obligations to the Company and requesting return of any Glint property.  (*Id.* at ¶ 28, Ex. B.)  Anderson took no action in response.

On May 8 and 9, 2018, Glint's IT personnel undertook an initial analysis of Anderson's laptop.  (Carey Decl., ¶ 12.)  Carey determined that between April 20 and April 27, 2018, Anderson downloaded to his desktop files relating to bids and other confidential information regarding deals where Glint is in direct competition with Perceptyx.  (*Id.*)  Carey was also able to determine that Anderson had attempted to access G-Suite from a non-Glint computer from Los Angeles, California, and Temecula, California (where Perceptyx maintains its principal place of

FENWICK & WEST LLP
ATTORNEYS AT LAW

business). (*Id.* at ¶¶ 13-14.) Uber receipts, forwarded to Anderson's Glint e-mail address, indicate he was traveling between Minneapolis and Southern California around the time of the attempted access. (Haskell Decl., ¶¶ 36, Exs. D and E.)

## VIII. GLINT CONTACTS ANDERSON AND PERCEPTYX TO NO AVAIL

On May 10, 2018, Glint's CRO Maloy called Anderson and told him that the Company had discovered he had downloaded Glint data without permission. (Maloy Decl., ¶ 8.) Anderson promised Maloy that he had not downloaded any information outside the normal scope of his work and that he had not shared any Glint data with Perceptyx. (*Id.*) Anderson swore "to God" and "on his life" that he did not improperly retain any Glint information or provide it to Perceptyx. (*Id.*) On May 12, 2018, Anderson called and texted Maloy, telling him that he was "freaking out." (*Id.* at ¶ 9.) During Maloy's discussions with Anderson on May 12, 2018, Anderson again swore to Maloy that he had not improperly retained any Glint data and that he had not and would not share any such data with Perceptyx. (*Id.*)

On May 11, 2018, Glint's outside counsel sent Anderson and Perceptyx formal demand letters asking them to immediately return all of its data and materials in their possession, and retain no copies. (Declaration of Sheeva Ghassemi-Vanni, ("Ghassemi-Vanni Decl."), ¶¶ 3-4, Exs. A and C.) Outside counsel further demanded written assurances that they had not retained any such data or materials. (*Id.*) In response, Anderson categorically denied any wrongdoing, but admitted for the first time that he had retained Glint company information and said that he would send back any Glint data still in his possession. (*Id.* at Ex. B.) Not only did this contradict his earlier representations to Maloy that he had retained no such information, to date, Glint has not received any of these files. Anderson assured Maloy on May 12th that Anderson was not soliciting any of Glint's customers, but three days later Glint learn Anderson had also lied about that when one of Glint's prospective customers inadvertently included Glint in an email thread where Anderson was trying to lure this prospect to Perceptyx.

In a separate letter, Perceptyx's CEO, John Borland, replied saying that he was aware of Anderson's obligations to Glint and provided his own categorical denials that Perceptyx had done anything inappropriate or otherwise benefitted from Glint's confidential data or information. (*Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW

at ¶ 4, Ex. D.) At no time did Anderson or Perceptyx reach out to outside counsel or to Glint to discuss a thorough investigation into Glint's concerns or even to work with Glint in determining whether Anderson had, in fact, engaged in the above-mentioned bad acts.

### IX. GLINT IS FORCED TO ENGAGE COMPUTER FORENSICS EXPERTS

Hearing dubious denials from Anderson and Perceptyx, the Company had a forensic analysis performed of Anderson's laptop and his access to G-Mail and G-Suite from that laptop. (Eskridge Decl., ¶ 5.) Glint's third-party computer forensics experts determined that Anderson had been courting Perceptyx for several years. (*Id.* at ¶ 20, Ex. C.) They further learned that Anderson received an offer of employment from Perceptyx on March 20, 2018 to his personal G-Mail account, which he accessed on his Glint laptop. (*Id.* at ¶ 23, Ex. F.)

The forensics experts further found evidence that, even before Anderson was told he would need to find another job, on April 9, 2018, he downloaded approximately 3,500 Glint files in approximately twenty minutes using a high-speed method of data transfer. (*Id.* at ¶ 15, Ex. B.)

### X. GLINT RECEIVES E-MAILS DEMONSTRATING THAT ANDERSON AND PERCEPTYX ARE USING GLINT'S PROPRIETARY INFORMATION

As soon as Anderson began working at Perceptyx, Glint's prospective customer opportunities in which Anderson had assisted went dark. (Haskell Decl., ¶ 34.) Prospects suddenly and unexpectedly stopped answering calls by Glint sales personnel. (*Id.*) On May 14, 2016, one such customer responded to a direct solicitation from Anderson's Perceptyx e-mail address, accidentally addressing the response to Anderson's *Glint* e-mail address, which was forwarded automatically to Haskell. (*Id.* at ¶ 35, Ex. C.) This e-mail exchange demonstrates that Anderson had made false promises when he assured Maloy that he was not targeting Glint customers.

### ARGUMENT

Under the DTSA and the CUTSA, a court may issue an injunction to prevent any "actual or threatened misappropriation." *See* Cal. Civ. Code § 3426.2; 18 U.S.C. § 1836(b)(3)(A). "A plaintiff seeking a [TRO] must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in

FENWICK & WEST LLP
ATTORNEYS AT LAW

his favor, and that an injunction is in the public interest"; or (2) plaintiff demonstrates that serious questions going to the merits were raised, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of hardships tips sharply in the plaintiff's favor, and that the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135 (9th Cir. 2011) (citing *Winter v. NRDC*, 555 U.S. 7 (2008)). A temporary restraining order may be issued if "immediate and irreparable injury, loss, or damage will result to the movant" if the order does not issue. Fed. R. Civ. P. 65(b).

## I. EVIDENCE UNCOVERED TO DATE DEMONSTRATES GLINT WILL SUCCEED ON THE MERITS OF ALL ITS CLAIMS

The evidence demonstrating that Anderson had long planned to leave Glint to join its direct competitor, Perceptyx, and had been downloading and transferring Glint data and files to himself prior to his departure is irrefutable. When challenged, Anderson and his new employer flatly denied any wrongdoing, made no offer to investigate the allegations and offered nothing more than empty promises that they would obey Anderson's contractual obligations and the law moving forward. Given the proof exposing Defendants' misrepresentations and evidence of misappropriation after receiving Perceptyx's offer, Glint is highly likely to succeed on the merits of its claims against both Anderson and Perceptyx.

### A. Glint is Likely to Succeed on the Merits of Its Trade Secrets Claims Under the DTSA and the CUTSA

Congress clearly intended to afford to data compilations and analyses of customer related information the trade secret protection of the DTSA. *See, e.g., id.* at *2 ("Examples of trade secrets include … customer lists.") (emphasis added). The CUTSA defines "trade secrets" as including information, compilations, programs, methods, techniques, or processes that 1) derive independent economic value from not being generally known to and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information; and 2) which the owner has taken reasonable measures to keep such information secret. *See* Cal. Civ. Code § 3426.1(d).

"It is universally recognized that information about customers can represent the most valuable secrets a business owns." James Pooley, Trade Secrets (2009) § 4.02[2][a] (citing

Restatement (Third) of Unfair Competition § 42, comment f (1995)).  Indeed, there is no shortage of relevant cases that have found similar customer information to qualify as protectable trade secrets under the CUTSA.  *Brocade Comm. Sys. Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1214 (N.D. Cal. 2012) (finding "customer-related information including … pricing guidelines … and customers' business needs/preferences ... is routinely given trade secret protection.");  *PQ Labs, Inc. v. Yang Qi*, No. 12-0450 CW, 2014 WL 4954161, at *5 (N.D. Cal. Sept. 30, 2014) (holding that the plaintiff's customer information, including "pricing history, pricing, customer information and sales data" constituted protectable trade secrets).  *See, e.g., Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1518, 1520 (1997); *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (finding that a customer database qualified as a trade secret because it had potential economic value to allow a competitor to direct its sales efforts to potential customers).

In this case, Glint tailors its product to the needs of each customer, whether that be through competitive pricing, customized survey questions, a customized dashboard, or customized feedback.  (Haskell Decl., ¶ 9.)  The bid packages reveal Glint's product functionality, the positioning of its products relative to its competitors (including Perceptyx), and more.  (*Id.* at ¶ 11.)  The Company pricing tables, pricing calculator, Glint's sales playbook (which includes a list of sales prospects), the Company's survey questions, screenshots of the Company's platform, and sales presentations given to customers would allow a competitor the opportunity to analyze, break down, and review in detail what makes Glint unique among its competitors.  (*Id.* at ¶ 12.)  Obtaining a copy of this information would greatly benefit the Company's competitors because it would allow them to see exactly what they are competing against.  (*Id.* at ¶ 13.)  With this information, a competitor could mimic Glint's proprietary survey questions and use the sales and pricing information to undercut the Company's marketing strategy, which in turn would damage Glint's customer relationships and divert business away from Glint.  (*Id.* at ¶ 14.)  Thus, these documents and the data mentioned above would, in the wrong hands, cause Glint irreparable harm.  (*Id.* at ¶ 15.)  All of this information derives independent economic value from not being generally known to, and not being readily

FENWICK & WEST LLP
ATTORNEYS AT LAW

ascertainable through proper means by, another person who can obtain economic value from its disclosure or use.

Such information constitutes a well-recognized form of trade secrets under CUTSA.  This information is not publicly known or readily ascertainable and it derives its economic value from the fact that it is secret because others in the industry would find value in its disclosure, which is likely the reason why Anderson spent his final weeks at Glint mining its cloud storage for valuable, confidential files.  Cal. Civ. Code § 3426.1(d)(1); *see also Whyte v. Schalge Lock Co.*, 101 Cal. App. 4th 1443, 1455 (2002) (noting that this type of information "has independent economic value because [the plaintiff's] pricing policies would be valuable to a competitor to set prices which meet or undercut [the plaintiff's].").

The information at issue was subject to efforts that were reasonable under the circumstances to protect its secrecy.  Cal. Civ. Code § 3426.1(d).  This information was not for disclosure outside the Company's business; the employees with access to this information, including Anderson, were subject to confidentiality agreements identifying this information as highly confidential and restricting its uses.  *See, e.g., Religious Technology Center v. Netcom On-Line Communications Services, Inc*., 923 F. Supp. 1231, 1253 (N.D. Cal. 1995) (noting that reasonable efforts can include "advising employees of the existence of a trade secret" and "requiring employees to sign confidentiality agreements"); *see also Bank of Am., N.A. v. Lee*, No. CV 08-5546 CAS (JWJX), 2008 WL 4351348, at *4 (C.D. Cal. Sept. 22, 2008) (noting that the plaintiff used reasonable efforts to keep its customer information secretive "based on the written [confidentiality] agreements … and their password protection system.").

Even at this very early stage of the case, the evidence submitted in these papers demonstrates that Anderson misappropriated Glint's trade secrets in violation of the DTSA and the CUTSA.  Anderson downloaded Glint's trade secrets over the weeks or months before his resignation, by which time he knew or had reason to know that doing so was improper, and where it constituted theft and a breach of his duty to maintain the secrecy of such information, both contractually and under relevant law.  Cal. Civ. Code § 3426.1.  California courts have also "equated acts of solicitation with 'use' or 'misappropriation' of protected information." *Morlife*,

*supra,* 56 Cal. App. 4th at 1524; *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1155 (2004) (CUTSA prohibits former employees from using client lists to solicit customers of their former employers). Both the DTSA and the CUTSA explicitly permit a court to enjoin even the threatened misappropriation of trade secrets. *See* Cal. Civ. Code § 3426.2(a); 18 U.S.C. § 1836(b)(3)(A).

### B. Glint is Likely to Succeed on the Merits of Its Breach of Written Contract and Breach of Loyalty Claims

Given the substantial evidence already described, there can be little doubt that Glint will also succeed on its breach of contract and breach of loyalty claims. Express confidentiality and non-disclosure agreements, such as the agreements at issue in this case, are valid and enforceable in California, and a breach of such agreement may be pursued through a common law breach of contract claim. *See, e.g., Oculus Innovative Scis., Inc. v. Nofil Corp.*, No. C 06-1686-SI, 2007 WL 4044867, at *3 (N.D. Cal. Nov. 15, 2007).

By the terms of that contract, Anderson agreed to "promptly deliver to the Company all documents and materials of any nature pertaining to [his] work with the Company, and … not [to] take with [him] or retain in any form any documents or materials or copies containing any Proprietary Information." (Haskell Decl., ¶ 18, Ex. A.) Based on the facts already presented to the Court at this very early stage, it is clear that Anderson did precisely the opposite of what his agreement required; Anderson downloaded and transferred the very data he agreed not to take with him. He also failed to return the files in the face of a direct request by Glint's General Counsel. While he eventually acknowledged retaining Company files and agreed to return them by his letter dated May 14, 2018, Glint has yet to receive these files as of the date of this motion. In light of these facts, Glint has demonstrated that he has breached his contractual obligations.

Anderson also breached his duty of loyalty as a result of his activities prior to departing Glint. *See Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 345-48 (1966); *Fowler v. Varian Assoc.*, 196 Cal. App. 3d 34 (1987); 4 Wilcox, California Employment Law, § 70.10 ("An employee who solicits an employer's customers prior to termination of employment may be subject to an action for breach of the duty of loyalty, as well as for misappropriation of a trade secret and unfair competition."). While working for Glint, Anderson owed an utmost duty of

FENWICK & WEST LLP
ATTORNEYS AT LAW

loyalty to the Company.  Nevertheless, he breached that duty by downloading Glint's proprietary materials and by using that information to solicit Glint's potential customers' business on behalf of Perceptyx.

## II. GLINT IS LIKELY TO SUFFER IRREPARABLE AND IMMEDIATE INJURY IN THE ABSENCE OF SWIFT INJUNCTIVE RELIEF.

"In general, the imminent use of a trade secret constitutes irreparable harm." *Gallagher Benefits Servs., Inc. v. De La Torre*, No. C 07-5495 VRW, 2007 WL 4106821, at *5 (N.D. Cal. Nov. 16, 2007), order aff'd in part, vacated in part sub nom. *Gallagher Benefit Servs., Inc. v. De La Torre*, 283 F. App'x 543, 546 (9th Cir. 2008) ("[T]he goodwill and customers that Gallagher would lose absent equitable relief supports [the lower court's] finding of irreparable injury."). "This is particularly true when the trade secret is a customer list, for solicitation of plaintiff's customers by defendants cannot be remedied by money damages alone." *Gallagher*, 2007 WL 4106821, at *5 (citation omitted); *see also Stuhlbarg Int'l Sales Co., v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001) ("[The former employee's] continued use of [the company's] confidential information … will likely cause serious damage to [the company's] reputation and client base…. The measure of this damage is simply unquantifiable.").

Courts in the Ninth Circuit often grant the type of injunctive relief requested here. *See, e.g., TMX Funding, Inc. v. Impero Techs., Inc.*, No. C. 10–00202 JF (PVT), 2010 WL 1028254, at *8 (N.D. Cal. Mar. 18, 2010) (granting injunctive relief, "California courts have presumed irreparable harm when proprietary information is misappropriated."); *Lillge v. Verity*, No. C 07–2748, 2007 WL 2900568, at *7 (N.D. Cal. Oct. 2, 2007) (granting injunctive relief and noting that when a plaintiff "risk[s] ... losing established customers to defendants ... due to [the] defendants' improper use of [the] plaintiff's proprietary information," there is "obviously ... a lasting, irreparable harm.").  Even though Anderson and Perceptyx have already made use of the ill-gotten information, continued irreparable harm to Glint would ensue immediately if the Court does not grant a TRO here.  Anderson and Perceptyx likely still possess and are exploiting Glint's

confidential information to plan their strategies both against Glint's current customers, prospects, products and services. In light of the hollow assurances provided to date, there is no reason to believe that either Anderson or Perceptyx would delay further use of the information unless enjoined.

### III. THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN FAVOR OF THE TRO

The balance of hardships likewise mandates that a temporary restraining order issue. If granted, the requested restraining order would work no hardship on Anderson and Perceptyx as all of the information at issue belongs exclusively to Glint. The narrow restraining order Glint seeks would not prohibit either Anderson or Perceptyx from doing anything that they are legally entitled to do. Rather, Defendants would simply be required to do what they are obligated to do.

On the other hand, the harm to Glint if no restraining order issues would be irreparable. Glint is already experiencing the fallout from Defendants' actions with regard to prospects suddenly being non-responsive and going cold. *See Xantrex Tech. Inc. v. Advanced Energy Indus.*, No. 07-02324, 2008 U.S. Dist. LEXIS 41206, at *43 (D. Colo. May 23, 2008) (finding balance of harms tilted in favor of plaintiff where "the core of its business strategies, marketing strategies and engineering information" were in the hands of a direct competitor by improper means, "outweigh[ing] any possible harm to Defendants.").[1]

### IV. THE COURT SHOULD GRANT TARGETED EXPEDITED DISCOVERY

Courts in the Ninth Circuit apply a flexible "good cause" standard to determine whether expedited discovery is warranted. *Semitool v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 274-75 (N.D. Cal. 2002) (expedited discovery granted on showing of good cause). Expedited discovery is proper where it may ultimately conserve the resources of the parties and the court by expediting the litigation. *Id.* No showing of irreparable harm is necessary. *Id.* In particular, courts recognize that expedited discovery is necessary and proper where, as here, a plaintiff seeks development of a full evidentiary record to support a motion for a preliminary injunction. *See*

---

[1] Where, as in this case, there is no possibility that a party will suffer any damage as a result of a TRO, the party seeking it is not required to post a bond. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). Furthermore, a strong likelihood of success on the merits may also favor "a minimal bond or no bond at all." *California v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985).

MPA ISO GLINT'S EX PARTE MOTION FOR
RESTRAINING ORDER AND EXPEDITED DISCOVERY          14          CASE NO. 3:18-CV-02886-CRB

FENWICK & WEST LLP
ATTORNEYS AT LAW

1  *e.g.*, *Pod-Ners, LLC v. Northern Feed & Bean*, 204 F.R.D. 675, 676 (D. Colo. 2002) (granting a
2  motion for expedited discovery and requiring defendants to respond within 11 days of service).
3        Although Glint has been able to conduct a forensic examination of Anderson's Glint-
4  issued laptop to deduce Defendants' theft of Glint's non-public, proprietary information, full
5  information and many probative documents concerning the misconduct lie exclusively in the
6  custody, control, or possession of Anderson and Perceptyx.  Without immediate access to such
7  evidence, Plaintiff would be severely hamstrung in its ability to establish a likelihood of success
8  on the merits of its claims and the resulting irreparable harm.  Furthermore, allowing Glint
9  expedited access to evidence would impose comparatively little inconvenience on Defendants
10  compared to the harm that Defendants' continued use of Glint's proprietary materials and
11  information would cause in the marketplace.  Glint's claims revolve around one focused set of
12  facts regarding Defendants' acts in the months before Anderson left Glint and shortly thereafter.
13        Because the relevant documents may only be available in electronic form and could
14  "easily be erased and manipulated," there is especially good cause for expedited discovery.  *See*
15  *Physicians Interactive v. Lathian Sys.*, No. CA-03-1193-A, 2003 U.S. Dist. LEXIS 22868, at *10,
16  *29-30 (E.D. Va. Dec. 5, 2003) (granting motion for expedited production of electronic data,
17  including "mirror image" of defendant's computer equipment that interacted with plaintiff's
18  servers).  Glint has carefully tailored its initial discovery requests to the issues directly pertinent
19  to the injunctive relief it seeks.  (*See* Declaration of John-Paul S. Deol ("Deol Decl."), ¶¶ 3-8,
20  Exs. A-F.)  Glint has also minimized the burden on Defendants by generally limiting its requests
21  for documents and interrogatories to cover a limited period of time – November 2017 to present.
22  Plaintiff seeks only two depositions on an expedited basis.  The depositions of Anderson and
23  Perceptyx's 30(b)(6) witness will also be a source of critical information.

## CONCLUSION

25        For the foregoing reasons, Plaintiff respectfully requests that the Court grant its motion for
26  temporary restraining order and expedited discovery, and issue an order to show cause why a
27  preliminary injunction should not be entered in this action.

| | | |
|---|---|---|
| 1 | Dated: May 17, 2018 | FENWICK & WEST LLP |
| 2 | | By: */s/ Patrick E. Premo* |
| 3 | | Patrick E. Premo<br>Attorneys for Plaintiff<br>GLINT INC. |