```
1  PATRICK E. PREMO (CSB No. 184915)
   ppremo@fenwick.com
2  SHEEVA J. GHASSEMI-VANNI (CSB No. 246639)
   sghassemi@fenwick.com
3  JOHN-PAUL S. DEOL (CSB No. 284893)
   jpdeol@fenwick.com
4  TIARA R. QUINTANA (CSB No. 315783)
   tquintana@fenwick.com
5  FENWICK & WEST LLP
   801 California Street
6  Mountain View, CA  94041
   Telephone:    650.988.8500
7  Facsimile:    650.938.5200

8  Attorneys for Plaintiff
   GLINT INC.
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLINT INC., a Delaware corporation,<br><br>            Plaintiff,<br><br>   v.<br><br>PERCEPTYX, INC., a California corporation; MITCHELL ANDERSON, an individual; and DOES 1 through 10, inclusive,<br><br>            Defendants. | CASE NO. 3:18-cv-02886-CRB<br><br>**DECLARATION OF DAVID L. HASKELL IN SUPPORT OF PLAINTIFF GLINT INC.'S EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER AND EXPEDITED DISCOVERY** |

FENWICK & WEST LLP
ATTORNEYS AT LAW

HASKELL DECL. ISO MOTION FOR TRO AND EXPEDITED DISCOVERY

CASE NO. 3:18-cv-02886-CRB

I, David L. Haskell, declare as follows:

1. I have been employed at Glint Inc. ("Glint" or the "Company") since May 1, 2017. I am Glint's Regional Vice President of Sales – West and was Defendant Mitchell Anderson ("Mr. Anderson")'s direct supervisor.

2. I make this declaration of my own personal knowledge, except to any extent otherwise specified. If called as a witness, I could and would testify competently to the facts set forth herein.

3. I have worked in sales since approximately 1993. Given my sales experience, I am familiar with sales and marketing practices across a variety of industries.

4. My job duties at Glint include, but are not limited to, hiring, training, and developing sales team members to achieve Glint sales goals. I am sometimes also called upon to terminate the sales team members who are underperforming consistently.

5. Since its formation in September 2013, Glint has invested millions of dollars developing its proprietary employee engagement software platform that collects and leverages real-time employee data to aid large corporations in increasing employee engagement, job satisfaction and overall performance. This allows businesses to increase employee engagement, develop their people, and improve business results.

6. In addition to its software platform, Glint has developed survey questions that it provides to its customers' employees containing proprietary open-ended and close-ended questions. Glint's proprietary software then analyzes the responses of each customers' hundreds or thousands of employees in real time to provide immediate feedback to the customers' management team, who has access to a personalized dashboard only visible to them. This process (including the dashboard Glint has created) allows the Company's customers to assess the engagement and satisfaction of their workforce in real time and make decisions based on the response data obtained from their employees.

7. To develop the set of survey questions used by Glint, the Company has spent millions of dollars and thousands of hours of research analyzing employee satisfaction questions. Based on this research and analysis, Glint has arrived at a set of proprietary survey questions that

FENWICK & WEST LLP
ATTORNEYS AT LAW

are stored in its Google drive and only accessible to those Glint employees who need to know and who are given the appropriate login credentials.

8.  Glint has numerous competitors in the same competitive space (*i.e.*, employee engagement and satisfaction). One such competitor is Defendant Perceptyx, Inc. ("Perceptyx"), which has been taking aim at Glint and exploiting a market that Glint has been far more successful in developing over a much shorter period of time.

9.  Our goal as a sales team is to tailor our product to the needs of each customer, whether that be through competitive pricing, customized survey questions, a customized dashboard, customized feedback, or otherwise. These are some of the things that differentiate us from our competitors.

10. To remain competitive, Glint spends thousands of hours and millions of dollars researching and creating its survey questions, confidential bids, product, product demos, sales playbooks containing pricing information, tailored sales presentations, and confidential benchmarking data, which the Company uses to help its customers understand what their level of employee engagement should be compared to other similar companies. Only employees who need to know have access to these files. Customers and Glint understand that any sales information distributed to customers is understood to be confidential and is frequently subject to non-disclosure agreements.

11. The bid packages prepared by Glint reveal its product functionality, the positioning of its products relative to its competitors (including Perceptyx), and more.

12. The Company pricing tables, Glint's sales playbook (which includes a list of sales prospects), the Company's survey questions, screenshots of the Company's platform, and sales presentations given to customers would allow a competitor the opportunity to analyze, break down, and review in detail what makes Glint unique among its competitors.

13. Obtaining a copy of the survey questions, pricing information, tailored bids, sales presentations, and related information would greatly benefit the Company's competitors because it would allow them to see exactly what they are competing against.

14. Knowing the price quotes that Glint provides to its potential customers would

FENWICK & WEST LLP
ATTORNEYS AT LAW

essentially allow Perceptyx (or any other competitor) to calculate a lower price and offer it to its customers to undercut Glint. Files I am told were accessed and downloaded on Mr. Anderson's laptop computer include both price quotes and Excel spreadsheets reflecting the bids. Mr. Anderson would understand and know how to use the Excel spreadsheets to mimic Glint's price calculator.

15. With this information, a competitor could also mimic Glint's proprietary survey questions and use the sales and pricing information to undercut the Company's marketing and sales strategy, which in turn would damage Glint's customer relationships and divert business away from Glint. These documents and the data mentioned above would, in the wrong hands, cause Glint irreparable harm.

16. Mr. Anderson was one of the members of my sales team, who worked for Glint remotely and was based in Minneapolis, Minnesota out of his home office.

17. I first met Mr. Anderson when I joined Glint in May, 2017, but I am informed and believe that he had begun working for the Company on or about September 19, 2016.

18. Like all of Glint's sales employees, Mr. Anderson signed an Employee Invention Assignment and Confidentiality Agreement ("Confidentiality Agreement"). A true and correct copy of Mr. Anderson's Confidentiality Agreement is attached hereto as **Exhibit A**.

19. After working with Mr. Anderson for some time, it became clear to me in late 2017 that he was not developing the skills, aptitude, or drive required to succeed at Glint.

20. In February, 2018, I told Mr. Anderson that his performance would need to improve and that he would need to meet his sales goals for the first quarter of 2018.

21. He neither met his sales goals for the last quarter of 2017 nor the first quarter of 2018.

22. On or about April 14, 2018, I told Mr. Anderson that he would need to find another job, either in a different role at Glint, or with another company.

23. I told Mr. Anderson that he could have thirty days to find a new job and offered to keep him on payroll, to work on two ongoing deals and allow him the opportunity to earn

FENWICK & WEST LLP
ATTORNEYS AT LAW

commissions on those two deals. I told Mr. Anderson that he should transition other matters to other Glint sales team members.

24. During the last week of April, 2018, Mr. Anderson came to me and told me that he had found another position outside of Glint. When I asked him where he was going, he refused to tell me. Based on his refusal, I immediately suspected that he was going to a competitor of Glint. I now understand from viewing his LinkedIn profile that he is working for our competitor, Perceptyx.

25. When Mr. Anderson told me he was leaving the Company, I wished him well. Nevertheless, he scolded me, telling me, "It wasn't my decision to leave Glint."

26. Mr. Anderson's last day of employment with Glint was May 1, 2018.

27. On or about May 3, 2018, one of the account executives at Glint, Cassidy Shore, told me that during the last few days of April, 2018, she was reviewing Glint's taxonomy of proprietary survey questions in Google Drive when she noticed Mr. Anderson was simultaneously reviewing the survey questions. This struck me as odd, because Mr. Anderson would have had no need to view Glint's survey questions so close to his separation from employment with Glint. He was doing no work that required access to those questions.

28. Because Cassidy's remarks created suspicion, on or about May 7, 2018, I recommended to Glint executives and officers that Glint should send Mr. Anderson a letter reminding him of his confidentiality obligations to the Company. Attached hereto as **Exhibit B** is a true and correct copy of the May 7, 2018 letter that was sent to Mr. Anderson.

29. My colleague, Anita Carey informed me that, between April 20, 2018 and April 27, 2018, Mr. Anderson downloaded to his desktop files relating to bids and other confidential information regarding deals, some of which were in direct competition with Perceptyx. These files include, but are not limited to, confidential competitive bid packages for deals in which Mr. Anderson had no involvement whatsoever and others in which he was involved, but that had since been reassigned to his colleagues.

30. Ms. Carey told me that Mr. Anderson also downloaded several additional bid packages on deals he had worked on in the past. These bid packages reveal Glint's product

functionality, the positioning of its products relative to its competitors (including Perceptyx), and more. Other files downloaded include Company pricing tables, Glint's sales playbook (which includes a list of sales prospects), the Company's survey questions, screenshots of the Company's platform, and sales presentations given to customers.

31. With the above information in Perceptyx's possession, Anderson and Perceptyx now have an opportunity to analyze, break down, and review in detail what makes Glint unique among its competitors.

32. Obtaining a copy of the survey questions, pricing information, tailored bids, sales presentations, and related information would greatly benefit the Company's competitors because it would allow them to see exactly what they are competing against. With this information, a competitor could mimic Glint's proprietary survey questions and use the sales and pricing information to undercut the Company's marketing strategy, which in turn would damage Glint's customer relationships and divert business away from Glint.

33. I believe that the data, documents, and information Mr. Anderson accessed and downloaded from Glint is its confidential and proprietary information and that, in Perceptyx's hands, that information would cause Glint irreparable harm.

34. Since his departure from Glint, several prospective customer opportunities with which Mr. Anderson had assisted went dark. Prospects suddenly and unexpectedly stopped answering calls from Glint's sales team.

35. On May 14, 2018, one such prospective customer responded to a direct solicitation from Mr. Anderson's Perceptyx e-mail address, accidentally addressing the response to Anderson's *Glint* e-mail address, which was forwarded automatically to me. Anderson's colleague from Perceptyx then invited the customer to set up a call to discuss a potential deal, unknowingly replying to Anderson's Glint e-mail account. Attached hereto as **Exhibit C** is a true and correct copy of that e-mail exchange.

36. Given that Mr. Anderson's Glint e-mail is being forwarded to me since his departure from Glint, I have also received other correspondence meant for him. For example, I have received

Mr. Anderson's Uber receipts for May 3 and May 4, 2018. Attached hereto as **Exhibits D and E** are true and correct copies of those e-mails.

37. On May 17, 2018, I accessed an online article discussing Perceptyx's business. Attached hereto as **Exhibit F** is a true and correct copy of that article.

38. Attached hereto as **Exhibit G** is a list of some of the Glint potential and active customers that Mr. Anderson downloaded information about and/or worked on while at Glint. Several of these potential customers have gone dark on and canceled meetings with Glint since Mr. Anderson's departure from the Company.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed this 17th day of May, 2018 in Redwood City, California.

DocuSigned by:
Dave Haskell
4045AEA52FB34C3...

David L. Haskell

HASKELL DECL. ISO MOTION FOR TRO AND EXPEDITED DISCOVERY    6    CASE NO. 3:18-cv-02886-CRB